UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JAMES FREEMAN, DIANE MESSER and Occupy AUGUSTA, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Docket no. 11-cv-00452-NT |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN E. MORRIS, MAINE COMM'R OF PUBLIC SAFETY, | ) ) | |

Defendant.

**OPINION AND ORDER**
**ON MOTION FOR PRELIMINARY INJUNCTION**

The Plaintiffs ask this Court to enjoin the State Commissioner of Public Safety from preventing them from maintaining a tent city in Capitol Park in Augusta and to enjoin the Commissioner from requiring them to apply for a permit for their encampment at Capitol Park. The Plaintiffs claim that their First and Fourteenth Amendment rights would be violated were they to be prohibited from maintaining indefinitely into the future a round-the-clock tent city at Capitol Park. Although the Court finds that the Plaintiffs' demonstration is protected by the First Amendment, that is not the end of the story. The State may impose reasonable time, place and manner restrictions on conduct or speech protected by the First Amendment. The Court finds that the State's permit requirement, its closing-hours regulation, and its long-standing no-camping rule are reasonable time, place and

manner restrictions which are narrowly tailored to further the significant government interests of public safety and of ensuring that the Park is adequately preserved and available for all comers. For the reasons set forth below, the Plaintiffs' Motion for Preliminary Injunction is DENIED.

## I.  PROCEDURAL BACKGROUND AND RELIEF REQUESTED

This case comes before the Court on the Plaintiffs' Motion for Temporary Restraining Order. This was converted into a motion for preliminary injunction by agreement of the parties following a November 28, 2011 telephone conference. The parties also at that time entered into a standstill agreement that was to expire following entry of this Court's Order on Preliminary Injunction. A hearing on the Plaintiffs' motion was held on the afternoon of December 5, 2011. James Freeman testified on behalf of the Plaintiffs, and Russell Gauvin, the Chief of Capitol Police, testified for the Defendant. Both sides also presented oral argument.

The Plaintiffs request that the Court enjoin Defendant John E. Morris, in his official capacity as Maine State Commissioner of Public Safety, and his agents (1) from requiring the Plaintiffs to obtain a permit for continuing their occupation of Capitol Park and (2) from "otherwise prevent[ing] the Plaintiffs from continuing to maintain the Occupy Augusta tent city on a 24 hour a day schedule." The Plaintiffs' Motion for Temporary Restraining Order at 1 (Doc. # 3) ("TRO Motion").[1]

---

[1] The Plaintiffs' Complaint seeks temporary followed by permanent declaratory and injunctive relief. In particular, the Plaintiffs request: (1) a declaration that their occupation of Capitol Park in Augusta, Maine is "protected as freedom of speech, assembly, association, and the right to petition the government under the First Amendment;" (2) a declaration that Subsection (2)(B) of the Capitol Area Security Rules, CMR 16-219-041, violates the First and Fourteenth Amendments of the United States Constitution, both facially and as-applied; (3) an injunction against the enforcement by the Defendant and those working in concert with the State, from enforcing CMR 16-219-041(2)(B); (4)

## II.    FACTUAL BACKGROUND

The Plaintiff Occupy Augusta is an association of individuals, including the Plaintiffs James Freeman and Diane Messer.[2]  The Plaintiffs took up occupation of the Capitol Park in Augusta, Maine on October 15, 2011, and have continuously occupied the Park since that date. The Occupy movement, including Occupy Augusta "seeks to expose how the wealthiest 1% of society are promulgating an unfair global economy that is harming people and destroying communities worldwide." Complaint, at ¶ 7 (Doc. # 1). The Plaintiffs explain in their Complaint that the 24-hour-a-day physical occupation of Capitol Park is a core component of their message. *Id.* at ¶ 11.  It is intended by the Plaintiffs to symbolize a permanent occupation that "challenges corporations' permanent occupation of the government." *Id.* at ¶ 17.

The Plaintiffs also aver that the tent city is an expression of hope for a more just, economically egalitarian society and that it functions as a model community demonstrating their vision of such a society.  *Id.* at ¶¶ 10, 22.  In particular, Occupy Augusta uses a "general assembly" to facilitate collective decision-making in an open, participatory and non-binding manner.  *Id.* The Plaintiffs state that the general assembly is an open forum held on most days, and that they welcome anyone to participate in it, both members and passersby. *Id.*

---

attorneys' fees; and (5) all other relief the Court deems just and proper.  Complaint at para. 37 (Doc. # 1).

[2] At the December 5, 2011hearing, this Court held that Plaintiff Occupy Augusta is a proper party to this case. *See Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 33, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

Finally, the Plaintiffs contend that the Capitol Park location is fundamental to their message, because locating the Occupy Augusta tent city directly in view of the Maine State Capitol building communicates a message to the government about Maine's economic policies and the role that government needs to take, which could not be communicated as effectively in another location. *Id.* at ¶¶ 4 and 18.

Capitol Park comprises approximately 20 acres in downtown Augusta.  It is situated across from the Capitol buildings and the Blaine House, the Governor's residence.  Approximately 20 to 25 Occupy Augusta participants reside in the tent city at Capitol Park, which encompasses about .75 acres within the Park.

The State has authorized the Commissioner of Public Safety to "adopt rules… subject to the approval of the Governor, governing the security regarding use and occupancy of all parks … maintained by the State at the capitol area or other state-controlled locations in Augusta."  25 M.R.S.A. § 2904. In turn, the Commissioner has promulgated CMR 16-219-041 (Capitol Area Security Rules).  CMR 16-219-041(2)(B) requires that anyone seeking to stage a demonstration in the Capitol Area first obtain a permit.

The application for a permit under CMR 16-219-041(2)(B), entitled "Capital [*sic*] Area Activity Permit Request," requires the applicant to state identifying and contact information; list the dates, times and description of the proposed activity; and specify the number of people expected to participate.  The applicant is required to sign beneath a list of prohibitions, conditions and restrictions, including a

prohibition against overnight camping. By signing the application, the applicant acknowledges and agrees to the listed conditions and restrictions.

At the December 5, 2011 hearing, Chief Gauvin testified that he was hired to his present position in 2006. At that time, the permit application already recited the Defendant's "no camping" policy. During his 5 ½-year tenure, it has been the practice of his unit to apply this and the other provisions recited within the permit application. Chief Gauvin explained that he does not review the content of the applicants' messages when they apply for either demonstration or use permits under CMR 16-219-041(2)(B) or (M). His understanding is that the Park is controlled by the legislative branch, who intended for it to be available for public use.

According to Chief Gauvin's testimony, he has reviewed approximately 300 applications during his tenure and has denied only three. Two of the three denied permits, a miniature train ride and an assembly of emergency vehicles to be parked on the grass, were denied because the Chief had concerns that the proposed activities would cause damage to the Park grounds. The third permit Chief Gauvin denied was for a group that wanted to gather in the Park at the same time that it was reserved for another group. The Defendant provided no evidence regarding the permitting practices of Chief Gauvin's predecessor.

The Plaintiffs never applied for a permit to use Capitol Park. Initially, a representative of the Capitol Police allowed the Plaintiffs to stay but advised them that they would have to rent porta-potties and restrict fires to closed grills. The

Plaintiffs complied with these requirements.  At the December 5, 2011 hearing, Mr. Freeman testified that he had ongoing conversations with the Capitol Police and the local fire department.  As the weather got colder, the Plaintiffs brought in a teepee and a four-season tent.  Together, these two structures can house approximately twenty-five individuals.  Until November 28, 2011, the Plaintiffs maintained a fire in the middle of the teepee, but they extinguished the fire after the parties reached a standstill agreement.  Mr. Freeman testified that a fire department official toured the camp and observed no fire hazards.

Chief Gauvin testified that on October 15, 2011, he informed Niels Christian, a member of Occupy Augusta, that they were not allowed to stay overnight. Chief Gauvin stated that he was told by members of Occupy Augusta that they were planning to stay anyway.

On Friday, November 25, 2011, Chief Gauvin informed the Plaintiffs that they would be required to remove all but one tent; that they would no longer be permitted to remain overnight; and that they would be required to obtain a permit. The Capitol Police gave Occupy Augusta until 5:00 PM, Monday, November 28, 2011, to submit a permit and until 10:30 PM to comply with the remaining requirements.

According to Chief Gauvin, this action was taken because the Plaintiffs' encampment had expanded, causing more permanent and serious damage to the Park's turf.  In addition, the combination of fires and other heating devices, pallets,

and hay, brought in to prepare for winter, created a fire hazard.  Chief Gauvin also cited his growing concern with the possibility for crime in the encampment.

In response to the Defendant's demands, the Plaintiffs on Monday, November, 28, 2011, filed the instant suit along with a Motion for Temporary Restraining Order.

## III.   STANDARD OF REVIEW

When deciding a motion for preliminary injunction, the Court weighs four factors: "'(1) the plaintiff's likelihood of success on the merits, (2) the potential for irreparable harm in the absence of an injunction, (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiff, and (4) the effect, if any, on the public interest.'" *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 11 (1st Cir. 2008) (quoting *United States v. Weikert*, 504 F.3d 1, 5 (1st Cir. 2007)).

## IV.   ANALYSIS

In a preliminary injunction analysis, "[t]he first factor, the plaintiff's likelihood of success, is 'the touchstone of the preliminary injunction inquiry'." *Boston Duck Tours, LP,* 531 F.3d at 11 (quoting *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998)).  "'If the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'"  *Boston Duck Tours, LP,* 531 F.3d at 11 (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).

In this case, the latter three factors – public interest, competing burdens, and irreparable harm – all follow the analysis concerning the likelihood of success on the merits. To the extent the Plaintiffs' activities are protected by the First Amendment against governmental intrusion, it is in the public interest to protect these activities, such protection cannot be considered a burden on the government, and an interruption of such protected activities would constitute irreparable harm.  *See Elrod v. Burns*, 427 U.S. 347, 352, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("there can be no impairment of executive power, whether on the state or federal level, where actions pursuant to that power are impermissible under the Constitution."), *id.* at 373 ("[t]he loss of First Amendment  freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.")  Accordingly, the Court's analysis focuses on the likelihood of success on the merits.

### A. Burdens of Proof

The Plaintiffs have the initial and overall burden of proof in this proceeding. As the party seeking a preliminary injunction the Plaintiffs bear the overall burden of establishing a likelihood of success on the merits of their claim. *See Esso Std. Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (citing *Nieves-Marquez* v. *Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)).  In the instant case, the Plaintiffs also bear the initial burden of demonstrating that their conduct is expressive.  *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 294, fn. 5, 104 S.Ct. 3065, 82 L.Ed. 2d 221 (1984) ("Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the

obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies.") Thereafter, on a First Amendment claim it is the Defendant's burden to demonstrate that the State's restrictions are constitutional.  *See Clark,* 468 U.S. at 294, fn.5.

### B. Likelihood of Success on Plaintiffs' First Amendment Claims

As we make our way through the complex thicket that is First Amendment analysis, the Court notes that a three-part test, following *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), has often been employed to guide the way.  Under this test, the court must: (1) assess whether the conduct or speech at issue is protected by the First Amendment, (2) identify the nature of the forum in order to determine the extent to which the government may limit the conduct or speech, and then (3) assess whether the justifications for restricting the conduct or speech satisfy the requisite standard. *Id*.

### 1. Assessing Whether the Conduct or Speech is Protected by the First Amendment

Conduct may constitute expressive activity protected by the First Amendment if: (1) those engaging in the conduct intend thereby to convey a particularized message, and (2) in the surrounding circumstances it is likely that the message would be understood by those who viewed it.  *Spence v. State of Washington*, 418 U.S. 405, 410-11, 94 S.Ct. 2727, 41 L.Ed. 2d 842 (1974); *Clark*, 468 U.S. at 294.

The Plaintiffs contend that their continuous occupation of a site within Capitol Park expresses their views about economic disparity and also expresses their hope for a more just and egalitarian society.  However, the Plaintiffs' conduct in "occupying Capitol Park consists of many different acts, not all of which are expressive conduct. Occupy Augusta not only maintains tents and holds general assemblies, but they also eat, drink and sleep on site. Their "occupation" of the site, therefore, cannot be considered as a unitary phenomenon, either expressive or not. The Court will focus on three particular features of the occupation that have become factually significant in the context of this case: (1) the tent city, (2) the overnight camping, and (3) the use of fire and other heating equipment on site.

### a. The Tent City

The Plaintiffs will likely prevail on their claim that their tent city is expressive conduct.  With their occupation of Capitol Park across from the Capitol, the Plaintiffs intend to convey a particularized message on behalf of those who have been unfairly excluded from participation in government. The Plaintiffs also intend to model an ideal form of governance.

The Court finds that Occupy Augusta's message is likely understood by those who view the tent city. *See Spence*, 418 U.S. at 410 (explaining that "it would have been difficult for the great majority of citizens to miss the drift of appellant's point" of an upside-down flag with a superimposed peace symbol, because the Cambodian incursion and Kent State tragedy had occurred "roughly simultaneous[ly].")  In this case, the October 2008 stock market crisis, subsequent bank bailouts, high

unemployment, deflation of the housing market, rise in foreclosures, and increasing disparity between the incomes of the highest wage-earners and the low and middle-income earners are all well-known and have set the stage for the Occupy movement. Groups associated with Occupy Wall Street have coalesced in cities around the nation and their protests have received wide coverage in the press.  Those who view the tent cities erected by the Occupy movement in general and by Occupy Augusta in particular are likely to understand that these tent cities in parks and squares near centers of government and finance symbolize a message about the unequal distribution of wealth and power in this country.

### b. *Overnight Camping*

The Plaintiffs argue that their need to camp on site – *i.e.*, to "occupy" the park 24 hours a day, seven days a week, indefinitely into the future – is central to their message. In *Clark*, the Supreme Court assumed without deciding that overnight camping may constitute expressive conduct. *Clark*, 468 U.S. at 296. The plaintiffs in *Clark*, demonstrating about the plight of the homeless, contested the application of a federal regulation that prohibited camping in Lafayette Park and on the Mall in Washington, D.C.  As here, *Clark* involved a symbolic city of tents and a desire by the demonstrators to camp overnight. The *Clark* Court recognized that parts of the camping activities could be seen as facilitative rather than expressive activity.  *Id.* ("although we have assumed for present purposes that the sleeping banned in this case would have an expressive element, it is evident that its major value to this demonstration would be facilitative.")

11

At least two other district court judges have held that the Occupy movement's tent cities and overnight camping are protected speech under the First Amendment. *Occupy Minneapolis v. County of Hennepin*, ___ F.Supp.2d ___, 2011 WL 5878359 at *4 (D. Minn., Nov. 23, 2011); *Occupy Ft. Myers v. City of Ft. Myers*, ___ F.Supp.2d ___, 2011 WL 5554034 at *5 (M.D. Fla., Nov. 15, 2011) (collecting cases). The First Circuit has held that sleeping is not protected activity if it is not expressive. *See Whiting v. Westerly,* 942 F.2d 18, 21 (1st Cir. 1991). The D.C. Circuit Court of Appeals has expressed the view that the cooking and camping portions of overnight vigils are outside the First Amendment. V*ietnam Veterans Against the War/Winter Soldier Org. v. Morton,* 506 F.2d 53, 57-58 (D.C. Cir. 1974). The Eleventh Circuit has expressed doubts whether sleeping can be protected by the First Amendment, but assumed that it was. *United States v. Gilbert*, 920 F.2d 878, 883-84 (11th Cir. 1991) (an individual who was angry with the Government and who lived outside federal building for six years could be enjoined from sleeping outside the federal building.) Finally, Justice Scalia has dissented expressly "to deny that sleeping is or can ever be speech for First Amendment purposes." *Community for Creative Non-Violence v. Watt*, 703 F.2d 586 (D.C. Cir. 1983) (Scalia, J., dissenting), *rev'd, Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

Whether camping and sleeping constitutes expressive conduct in this case is a close call, but the Court finds that the Plaintiffs have met their burden of establishing that they are likely to succeed in their claim that their round-the-clock

occupation with its attendant overnight camping is expressive conduct protected by the First Amendment.

### c.  The Use of Fire and Other Heating Equipment

The Plaintiffs do not contend in their complaint or motion that the use of fire and other heating equipment within the tent city constitutes expressive conduct. Mr. Freeman testified at the hearing on the Motion for Preliminary Injunction that the fire within the encampment's teepee was to keep them warm.  Because the fires are not expressive conduct, they do not fall within the protection of the First Amendment.  It remains only to be noted that the Defendant may enforce any applicable restrictions on the use of fire within the camp site in the usual manner in which such restrictions are enforced.

### 2.  Identifying the Nature of the Forum

The parties do not dispute that Capitol Park is a traditional public forum and, as such, has a "special position in terms of First Amendment protection." *Boos v. Barry*, 485 U.S. 312, 318, 108 S. Ct. 1157, 99 L. Ed. 2d 333 (1988) (quoting *United States v. Grace*, 461 U. S. 171, 180, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)).  Some of the Supreme Court's First Amendment jurisprudence state that regulations bearing on expressive activities that take place in a public forum must be strictly scrutinized. *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). However, in the *Clark* case, which certainly is closely aligned with the instant case, the Supreme Court used the "substantial government interest" standard rather than the "compelling government interest"

13

standard usually seen in strict scrutiny. The Court will apply the test as set forth in *Clark*.

### 3. Assessing Whether the State's Justification for Restricting Speech Satisfies the Requisite Standard

Finding that conduct is protected by the First Amendment and that the Park is a public forum only begins the inquiry. As the Supreme Court stated in *Clark*:

> Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. We have often noted that restrictions of this kind are valid provided that they are justified without reference to the context of the regulated speech, that they are narrowly tailored to serve a significant governmental interest and that they leave open ample alternative channels for communication of the information.

*Clark,* 468 U.S. at 293. Because the Plaintiffs' "occupation," including their round-the-clock maintenance of a tent city on Park grounds, is likely to be considered constitutionally-protected expressive conduct, the Court next considers whether the regulations impacting the maintenance of this tent city are content-neutral, whether they are narrowly tailored to serve significant government interests and whether they leave open ample alternatives for communication. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *Jews for Jesus, Inc. v. Massachusetts Bay Transp. Auth.,* 984 F.2d 1319, 1323 (1st Cir. 1993). The Court will address, in turn, the three regulations/rules/policies at issue: the permit regulation, the closing time regulation and the "no camping" policy.

### a.  *The Permit Regulation*

The Plaintiffs assert that CMR 16-219-041(2)(B) is unconstitutional both on its face and as applied to their occupation of Capitol Park.  CMR 16-219-041(2)(B) states in full:

> No person shall cause or participate in a demonstration of any nature in the Capitol Area unless written permission for such demonstration has been obtained from the COMMISSIONER OF PUBLIC SAFETY or his Designee.  An application, in writing setting forth information as may be required, is necessary prior to the granting of any permit.

The Plaintiffs' primary grievance with the permit requirement is that it gives unfettered discretion to the Commissioner of Public Safety or his Designee to decide whether to issue a permit.  TRO Motion at 7-8 (Doc. # 3).  They also complain that the regulation is overbroad because it applies not only to groups, but also to lone individuals.  *Id.*

### i.    **Overbreadth Challenge**

The Plaintiffs do not cite any Supreme Court or First Circuit authority to support their overbreadth challenge but rely on *Broadley v. United States Dep't. of Interior*, 615 F.3d 508 (D.C. Cir. 2010) and the cases cited therein. The First Circuit, however, has signaled that it will not consider a regulation overbroad merely because it applies to single protesters. *See New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 26-68 (1st Cir. 2002) (rejecting claim that regulations are not narrowly tailored because they encompass even a solitary leafletter); *Jews for Jesus, Inc.*, 984 F.2d at 1328 (same).

## ii.    Unfettered Discretion

The Supreme Court in *Thomas* stated:

> [W]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content. We have thus required that a time, place, and manner regulation contain adequate standards to guide the official's decision and render it subject to judicial review.

*Thomas v. Chicago Park District*, 534 U.S. 316, 323, 122 S.Ct. 775, 151 L.Ed. 2d 783 (2002).  In *Thomas*, the plaintiffs challenged an ordinance that required persons to obtain a permit in order to "conduct a public assembly, parade, picnic or other event involving more than fifty individuals." *Id.* at 318.

The ordinance in *Thomas* contained adequate standards to guide an official's decision. The ordinance spelled out 13 bases that the Park District could use to deny an application, including: that the park was already in use, that the applicant had previously damaged the park, and that the activity posed a risk to health and safety of the applicant or other users of the park.  None of the grounds for denying a permit had anything to do with what a speaker might say.

> [T]he object of the permit system (as plainly indicated by the permissible grounds for permit denial) is not to exclude communication of a particular content, but to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event.

*Id.* at 322.  The Supreme Court upheld the Chicago Park District's regulatory scheme as constitutional.

The Commissioner's regulatory scheme is distinguishable from the Chicago Park District's scheme. Although many of the rules and regulations contained in the Capitol Area Security Rules and the permit application provide the same type of standards that the Chicago Park District used, CMR 16-219-041(2)(B) does not explicitly state that the Commissioner can only deny an application if he finds that the applicant will not agree to the stated rules. In contrast, the *Chicago Park District* regulation explicitly limited the grounds for denial of a permit to the 13 listed grounds. *Thomas*, 534 U.S. at 319.

The Supreme Court was faced with a permit regulation that provided no limits on the decision-maker's discretion in *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 770, 108 S.Ct. 2138, 100 L.Ed. 2d 771 (1988). There, the City of Lakewood enacted a regulation which gave the mayor unfettered discretion to decide whether to issue permits for news racks on city sidewalks. The Supreme Court stated:

> The city asks us to presume that the mayor will deny a permit application only for reasons related to the health, safety, or welfare of Lakewood citizens, and that additional terms and conditions will be imposed only for similar reasons. This presumes the mayor will act in good faith and adhere to the standards absent from the ordinance's face. But this is the very presumption that the doctrine forbidding unbridled discretion disallows. E.g., *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). *The doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction or well established practice.*

*Id*. at 770 (emphasis added) (some citations omitted). The Supreme Court qualified what considering "implicit limits" meant in footnote 11:

> It is true that when a state law has been authoritatively construed so as to render it constitutional, or a well-understood and uniformly applied practice has developed that has virtually the force of a judicial construction, the state law is read in light of those limits. That rule applies even if the face of the statute might not otherwise suggest the limits imposed. *Poulos v. New Hampshire,* 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953). Further, this Court will presume any narrowing construction or practice to which the law is "fairly susceptible."

*Id.* at fn. 11. The ordinance at issue in *Lakewood* had been recently enacted and the city had not yet developed any practice by which the statute's construction could be narrowed, and so the regulation was found to be unconstitutional.

The Defendant has provided in his supplemental briefing evidence of a narrow administrative construction of the "demonstration" permit requirement. According to the Defendant, the discretion of the Commissioner is constrained by the other regulations in the Capitol Area Security Rules,[3] and by the rules,

---

[3] CMR 16-219-041, subsection (2) reads in its entirety:

A. The COMMISSIONER OF PUBLIC SAFETY is empowered to close, secure and limit access to all or a portion of the Capitol Area at stated times during hours when the state offices are closed, or, without prior notice, at any other time should a situation develop wherein all or a portion of the Capitol Area becomes jeopardized by the actions of any person or persons.

B. No person shall cause or participate in a demonstration of any nature in the Capitol Area unless written permission for such demonstration has been obtained from the COMMISSIONER OF PUBLIC SAFETY or his Designee. An application, in writing setting forth information as may be required, is necessary prior to the granting of any permit.

C. No person shall cause injury or damage to the trees, shrubbery or flowers in the Capitol Area, or damage, mar or deface the buildings, personal property or facilities thereon in any way.

D. No person shall attach or place a handbill or advertising material on any vehicle parking in the Capitol Area.

E. No person shall allow a pet to enter the Capitol Area without a physical restraint.

F. No person, except a police officer on duty, shall carry firearms, dangerous weapons, explosives, incendiary devices, or implements which by their nature are capable of being used to destroy or injure a person or property in the Capitol Area.

conditions and restrictions contained in the permit application.[4] "The Regulations and the application form provide the only limitations on the granting of a permit. . . There is no discretion. . ."[5] Def's Response to TRO Motion at 4 (Doc. #19*).*

---

G. No person shall possess or consume any alcoholic beverage in the Capitol Area, except at the Blaine House Complex with the Governor's permission.

H. No person shall discard litter, as defined in <u>17 M.R.S.A., Section 2263</u>, sub-section 2, in the Capitol Area except in the containers provided therefor.

I. No person shall, without the prior written authorization of the CHIEF OF CAPITOL SECURITY light or add fuel to an outdoor fire in the Capitol Area, except one which is confined to a fireplace furnished for the purpose by the DIRECTOR OF PUBLIC IMPROVEMENTS.

J. No person shall solicit, give away, canvass, sell or offer for sale items or materials or make collections for past or current obligations in the Capitol Area without written authorization from the Bureau of Capitol Security.

K. No person shall operate a mini-bike, snowmobile, all terrain vehicle or unregistered vehicle in the Capitol Area.

L. No person shall utilize the Capitol Area for any type of sports or athletic events, either formal or informal, except in those sections designed by the DIRECTOR OF PUBLIC IMPROVEMENTS or SUPERINTENDENT OF AUGUSTA MENTAL HEALTH INSTITUTE or with permission from the CHIEF OF CAPITOL SECURITY.

M. Persons or organizations seeking to use a designated portion of the Capitol Area must obtain a written permit by applying, in writing, to the COMMISSIONER OF PUBLIC SAFETY or his designee, and specifying the use intended and the persons responsible for the supervision of the activity.

[4] The Permit application provides:
Please be advised:
- Vehicles are not allowed on the grass of Capitol Park or the lawns around Capitol area buildings.
- No overnight camping is allowed in Capitol Park or on the grounds of Capitol area buildings.
- The renting of portable toilets may be required for large or extended length activities.
- Any BBQ grills, or other authorized cooking facilities, must be manned by an adult at all times and fire extinguishers must be nearby.  Any tents permitted must be fire rated.
- If the event involves the selling or giving away of food, or the use of any energy source, (i.e.: electricity, propane, gasoline, black powder) a certificate of insurance may be required.  For large events, we may need a specific policy covering the organization. For small events, a homeowners' policy rider may be sufficient.
- A security deposit of $200 per hundred persons attending, or the posting of a security bond, may be required. The security deposit or security bond will be applied against any damage or clean up costs associated with the event.

The Plaintiffs object to the Defendant using informal rules or policies such as the no-camping rule found in the permit application on the ground that "any pronouncement that is not a rule or a regulation is not judicially enforceable." Plaintiffs' Memorandum re: Defendant's Response in Opposition at 2 (Doc. #20). The Supreme Court and the First Circuit, however, direct the Court to consider not just formally adopted regulations, but narrowing constructions and practices to which the law is "fairly susceptible." *Lakewood*, 486 U.S. at 770, n.11; *New England Regional Council of Carpenters*, 284 F.3d at 26. *See also*, *Wells v. City and County of Denver*, 257 F.3d 1132, 1150 (10th Cir. 2001) (Assessing a facial challenge to an unattended display ban and finding that "the fact that Denver's policy is unwritten is not fatal, but merely a factor to be considered"); *Lebron v. National R.R. Passenger Corp.,* 69 F.3d 650, 658 (2d Cir. 1995) ("The fact that a

---

CONDITIONS AND RESTRICTIONS:
The permit, if issued, will authorize the applicant/permittee, and the organization which he/she represents, to engage only in the activity described in the permit and only at the location(s) specified in the permit. No weapon of any kind and **no sign, poster or banner on stake(s)** can be brought into any Capitol Area State building. The responsibility for the supervision of this activity is the obligation of the applicant as is the responsibility for cleaning up the area at conclusion of the activity. These activities will be non-intrusive and will cause no damage to turf, shrubs, trees or other public property; and, that the applicant is responsible for any and all damage and any clean up costs. Dependent on the location and activity requested, other conditions or restrictions may be imposed or required as need for public safety purposes.
*(emphasis in original).*

[5] The Plaintiffs object to the Defendant using informal rules or policies such as the no-camping rule found in the permit application on the ground that "any pronouncement that is not a rule or a regulation is not judicially enforceable." Plaintiffs' Memorandum re: Defendant's Response in Opposition at 2 (Doc. #20). The Supreme Court and the First Circuit, however, direct the Court to consider not just formally adopted regulations, but narrowing constructions and practices to which the law is "fairly susceptible." *Lakewood*, 486 U.S. at 770, n.11; *New England Regional Council of Carpenters*, 284 F.3d at 26. *See also*, *Wells v. City and County of Denver*, 257 F.3d 1132, 1150 (10th Cir. 2001) (Assessing a facial challenge to an unattended display ban and finding that "the fact that Denver's policy is unwritten is not fatal, but merely a factor to be considered"); *Lebron v. National R.R. Passenger Corp.,* 69 F.3d 650, 658 (2d Cir. 1995) ("The fact that a policy is not committed to writing does not of itself constitute a First Amendment violation.")

policy is not committed to writing does not of itself constitute a First Amendment violation.")

*Lakewood* directs the courts to consider "binding administrative construction" in addition to evidence of long-established practice. *Lakewood*, 486 U.S. at 770, fn. 11; *New England Regional Council of Carpenters*, 284 F.3d at 18 ("We must give weight to the agency's narrowing interpretation of its own regulations – especially since the record contains no evidence that the regulations have been administered in an unfair discriminatory fashion."); *see also Osborne v. Ohio*, 495 U.S. 103, (1990) (allowing courts to avoid invalidating laws claimed to impinge on First Amendment freedoms through narrow construction of such laws).   Given that the State has made a public pronouncement in this litigation about its narrowed construction, the Court will consider the State's narrowed construction "binding."

Additionally, it is the Defendant's position that the Court should consider the Commissioner's longstanding practice of granting permits subject only to the limitations set forth in its rules and permit application. Def's Response to TRO Motion at 4 (Doc. #19*)*. The Defendant has established a practice going back nearly five and a half years during the tenure of Chief Gauvin.  The Chief has considered about 300 permit applications and denied only three. He denied two permits because he felt that the applicants would damage the Park and the third was denied because an applicant's request conflicted with another event already scheduled. The Chief testified that he basically grants a permit if the group agrees to abide by the conditions contained in the permit application.  The nature of the

demonstration does not come into his analysis.[6] The Court finds that Defendant will likely meet his burden of demonstrating a long-established practice of granting permits to protestors who agree to abide by the rules set forth in the Capitol Area Security Rules and the permit application.

The Defendant's limiting construction – which is based on the entire context of the regulatory scheme, incorporates the rules contained in the permit application, and rests on the uniform and long-standing practice of content-neutral application – brings this case in alignment with the *Thomas* case. *See Thomas*, 534 U.S. at 322. The Court finds that the permit regulation, as narrowly construed and applied by the Commissioner, is content-neutral and narrowly tailored to meet the significant[7] state interests of assuring the preservation of park facilities, preventing dangerous uses and coordinating multiple uses of the Park.  Since Capitol Park is still available to the Plaintiffs, albeit governed by the Commissioner's rules, there is a sufficient channel for communication which has been left open to the Plaintiffs. Accordingly, the Court concludes that the Plaintiffs are not likely to prevail on the merits of their claim that the permit regulation is unconstitutional.

---

[6] Chief Gauvin testified that it is his understanding from the legislative council that the Park should be generally made available to those who want to use it. Indeed, the Standard Operating Procedures for the Capitol Police, in a section on dealing with protestors, states: "**REMEMBER PEOPLE HAVE A CONSTITUTIONAL RIGHT OF PEACEFUL ASSEMBLY.**" General Order of the Bureau of Capitol Security regarding Emergency and Routine Incidents.  (Doc. # 19, Exhibit 1). This allows the Court to infer that the Chief's liberality in granting permits has an institutional basis.

[7] The Court notes that CMR 16-219-041(2)(B) applies only to a person or persons who wish to engage in a demonstration.  As such, the rule targets protected First Amendment conduct directly.  *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed. 2d 672 (1968) (distinguishing those laws that merit strict scrutiny from those that merit only intermediate scrutiny on the basis of whether the law hits speech because it is aimed at speech or hits speech only incidentally). Even if the proper standard is strict scrutiny, the Court finds that the Commissioner's interests are compelling.

### b. *The Stated Hours Regulation*

The Commissioner has a regulation allowing him to close the Park. The regulation provides:

> The COMMISSIONER OF PUBLIC SAFETY is empowered to close, secure and limit access to all or a portion of the Capitol Area at stated times during hours when the state offices are closed, or, without prior notice, at any other time should a situation develop wherein all or a portion of the Capitol Area becomes jeopardized by the actions of any person or persons.

CMR16-219-041(2)(A). The Commissioner concedes that there are currently no signs posted advising the public of Capitol Park's hours of operation. However, Chief Gauvin averred in his affidavit and at the December 5, 2011 hearing that signs listing the closure of the Park at 10:00 PM had at one time been posted, at least as recently as August, 2006.  These signs are no longer posted, perhaps as a result of work that had been done on the Park that caused their removal. In addition, the Defendant has filed a copy of a General Order of the Bureau of Capitol Security regarding Emergency and Routine Incidents.  (Doc. # 19, Exhibit 1).  This Order memorializes internal policies of the Bureau of Capitol Police and states at page 11, paragraph (H) (Part XV General Procedures Issues): "Under normal conditions, Capitol Park will be open at the break of day and will remain open until midnight." The Defendant states in his supplemental memorandum that:

> [T]he two-hour buffer between the time of closing on the signs and the Officers clearing out of the Park is a reasonable accommodation to users of the Park and the Officers themselves.  Effectively, 10:00 p.m. is when the Park users should leave, and midnight is when the Capitol Police ensure the Park is empty.

Defendant's Response in Opposition TRO Motion at pg. 4 (Doc. #19).  The Court gives weight to this explanation as an administrative interpretation by the Defendant of his own policy and finds no reasoned basis to controvert it.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 795-96 (1989) (recognizing and giving weight to a city's administrative interpretation of its own guidelines in the context of a First Amendment challenge).

There is no evidence to suggest that the Defendant is creating a *post hoc* closing time to provide an independent justification to require the Plaintiffs to leave at night. Arguably, the Plaintiffs already have received notice of the stated time of the Park's closure, at the very least through this litigation.  Furthermore, there is no impediment to the Defendant re-posting the signs regarding Park closure that had previously existed.

The Plaintiffs do not challenge the constitutionality of this rule.  For the sake of clarity, however, and because the Plaintiffs are asking the Court to enjoin the Commissioner from "otherwise preventing the Plaintiffs from continuing to maintain the Occupy Augusta tent city on a 24 hour a day schedule," the Court finds that this rule is likely to be found a content-neutral time, place, and manner regulation that is narrowly-tailored to meet the State's significant interests in public safety and preservation of the public resource that is Capitol Park.

Accordingly, the Defendant will not be enjoined from enforcing this rule, including its reasonable adjunct that closure of the Park at 10:00 PM requires those within the Park to take their things and vacate the premises.

### c.  *The Overnight Camping Policy*

The Defendant has a policy prohibiting overnight camping within Capitol Park.  The permit application states: "No overnight camping is allowed in Capitol Park or on the grounds of Capitol area buildings."

The Plaintiffs challenge whether the Defendant's "no camping" policy is cognizable as a judicially-enforceable rule or regulation. They contend, in particular, that a practice or policy is not judicially enforceable unless it is adopted through an administrative procedure allowing for notice and public comment.  This ground has already been plowed. See, *supra* section IV.B.3.a.ii.  Since the Court may consider established practices and unwritten policies, there should be no impediment to the Court's consideration of a written policy just because it is found on the permit application rather than in the Park's security rules.

According to Chief Gauvin, the no-camping prohibition has been stated within the permit application since at least 2003.  In addition, since at least 2006, when Chief Gauvin's tenure commenced, no one has even asked to camp overnight in the Park.

With regard to the constitutionality of the "no camping" policy, the Supreme Court's analysis in *Clark*, 468 U.S. at 294, controls. In *Clark*, the Supreme Court held that a federal regulation prohibiting camping on these sites was a reasonable time, manner, and place restriction.  *See id.*  The Court noted in particular that:

> [T]he regulation [prohibiting camping] narrowly focuses on the Government's substantial interest in maintaining the parks in the heart of our Capital in an attractive and intact condition, readily

available to the millions of people who wish to see and enjoy them by their presence.

*Id.* at 296.

The Plaintiffs attempt to distinguish *Clark* by claiming that the plaintiff in *Clark* had not definitively established the relation of the encampment to their message. But the Court in *Clark* assumed without deciding that the camping at issue was protected conduct under the First Amendment. *See Clark*, 468 U.S. at 294. The Plaintiffs also attempt to distinguish *Clark* on the ground that there is no alternative place within Augusta for them to camp. However, it does not make sense to fault the State for failing to provide other places within Augusta to camp given the Plaintiffs' insistence that their message is dependent on their proximity to the seat of government control. Furthermore, the Court's rulings do not require Occupy Augusta to leave the Park outright, but merely to follow the rules of the Park. Under the Commissioner's narrowed construction of the regulations, Occupy Augusta would qualify for a permit to demonstrate in Capitol Park if it agrees to abide by the rules. Accordingly, the Court finds that there are alternative channels available to Occupy Augusta to convey its message.

The Plaintiffs claim a First Amendment right to continuous occupation of a public park that has historically been the site of numerous political rallies and demonstrations. If the Plaintiffs' claim were ultimately vindicated, it would come at the expense of others who wish to use the Park to promulgate their own ideas. The Plaintiffs presently "occupy" about ¾ of an acre of land directly in view of the Maine State Capitol. The Plaintiffs do not believe either the duration of their stay or their

26

geographical location should be circumscribed. This prized location has symbolic value to other groups seeking to exercise First Amendment rights as well.

Allowing the Plaintiffs to continue indefinitely to occupy the Park would ultimately tend to suppress, rather than promote, the free exchange of ideas. As a traditional public forum, Capitol Park should be available to all comers to communicate their ideas, not just Occupy Augusta.

## **CONCLUSION**

The Plaintiffs' request for preliminary injunction is DENIED.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 7th day of December, 2011.